IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| NANCY A. HANNA, | ) | CIVIL NO. 08-00243 JMS/KSC |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING DEFENDANT |
| | ) | STATE OF HAWAII, DEPARTMENT |
| vs. | ) | OF EDUCATION'S MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| DEPARTMENT OF EDUCATION | ) | |
| and JOHN SOSA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER GRANTING DEFENDANT STATE OF HAWAII, DEPARTMENT OF EDUCATION'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This is an employment discrimination action brought pursuant to Title VII, 42 U.S.C. § 2000e-5, against Defendants State of Hawaii, Department of Education (the "DOE") and John Sosa ("Sosa").[1] Plaintiff Nancy Hanna ("Hanna") alleges in her First Amended Complaint ("FAC") that the DOE wrongfully terminated her employment as a DOE teacher in violation of Title VII because of race, sex, "age, retaliation [sic] and harassment." FAC at 3. The DOE has moved

---

[1] On October 12, 2010, the court dismissed claims against Sosa in his individual capacity. Doc. No. 55. (Citations to the record refer to docket entries in the court's Electronic Case Filing system for this case.) Sosa was the Principal of Aiea High School during the relevant school year, Doc. No. 63-4, and was Hanna's supervisor. Individual supervisors, managers, or other agents are not "employers" under Title VII. *See, e.g.*, *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir. 1993).

for summary judgment.  After careful review of the record and the arguments submitted, and construing the record in the light most favorable to Hanna, the court finds no evidence of violations of Title VII and thus GRANTS the Motion.

## II. <u>BACKGROUND</u>

### A.    **Factual Background**

This factual background is based on evidence submitted by the DOE and allegations in the FAC, and draws in large part on (1) an arbitration decision regarding Hanna's termination and (2) declarations from DOE witnesses who testify to the same events as in the arbitration.  *See* Doc. Nos. 63-4, 63-5, 84-1, 84-2 and 84-3.[2]

---

[2] Hanna's Opposition consists of argument and unauthenticated exhibits (a partial transcript from the arbitration, and documents such as emails and notes from the relevant school year).  *See* Doc. No. 83.  Hanna did not submit a declaration in compliance with 28 U.S.C. § 1746 or an affidavit.  The lack of any properly-submitted evidence by Hanna is, by itself, a basis for granting the DOE's Motion (where the evidence in the record does not otherwise indicate a triable issue of material fact).  *See* Local Rule 56.1(g); Fed. R. Civ. P. 56(e)(3).  On November 24, 2010, the court specifically instructed Hanna as to the requirements for opposing a summary judgment motion, explaining:

> You must set forth specific facts in declarations, depositions, answers to interrogatories, or authenticated documents, as provided in Federal Rule of Civil Procedure 56(e) [now 56(c)], contradicting the facts shown in the defendant's declarations, documents, or evidence, and showing that there is a genuine issue of material fact for trial.  If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you.

Doc. No. 66 at 2.  Nevertheless, because Hanna is proceeding pro se and because the court finds it prudent to address the merits (or lack thereof) of the FAC now, the court will review the statements made in Hanna's signed Opposition.  *See Eldridge v. Block*, 832 F.2d 1132, 1137 (9th

(continued...)

Hanna was a tenured DOE teacher. She is caucasian and was sixty years old in 2007. Doc. No. 63-12. The DOE terminated Hanna's employment effective on September 5, 2007 by an August 20, 2007 termination letter. Doc. Nos. 63-4, 63-7. The termination was based on a May 24, 2007 Professional Evaluation Program for Teachers ("PEP-T") evaluation, covering most of Hanna's 2006-07 school year at Aiea High School. Doc. No. 63-8. The PEP-T evaluation rated Hanna's performance as "unsatisfactory" in all five of its defined duties, with a corresponding overall rating of "unsatisfactory." *Id.*[3]

The PEP-T evaluation included a ten-page summary, with 246 pages of attachments regarding Hanna's 2006-07 school year. The attachments consisted of counselor reports, summaries of student comments and parental calls to the Principal, lesson plans, various documents regarding Hanna's performance from

---

[2](...continued)
Cir. 1987) ("The Supreme Court has instructed the federal courts to liberally construe the 'inartful pleading' of pro se litigants.") (citing *Boag v. MacDougall*, 454 U.S. 364, 365 (1982)). Similarly, the court will review Hanna's exhibits without authentication as they are documents regarding, or apparently submitted during, the arbitration (and some are duplicates of evidence submitted by the DOE). *See Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011). As set forth below, even if the court considers her exhibits and statements as properly-submitted evidence under Rule 56, her claims fail as a matter of law.

[3] On June 18, 2007, the Complex Area Superintendent, Alfred Navares, had recommended Hanna's termination. After that recommendation, Hanna and a representative of the Hawaii State Teachers Association ("HSTA") met on July 25, 2007 with then-DOE Superintendent Patricia Hamamoto. Doc. No. 63-7; 63-10 at 14. Hamamoto's termination decision was based on the unsatisfactory PEP-T, documents from Sosa and Navares, and additional documents and statements from the July 25, 2007 meeting. Doc. No. 63-10 at 14.

administration (and Hanna's responses), internal emails, and other documents relevant to the PEP-T evaluation. Doc. No. 63-8.

After receiving the August 20, 2007 termination letter, the Hawaii State Teachers Association ("HSTA") filed a grievance on Hanna's behalf against the DOE on August 28, 2007. Doc. No. 63-10, at 2. An arbitration took place from September 8 to 16, 2008, in which the issue was "whether [Hanna] was terminated without just and proper cause." *Id.* On January 5, 2009 -- in a twenty-five page, single-spaced Arbitration Decision and Award -- an arbitrator denied the grievance and concluded that termination had been appropriate. Doc. No. 63-10.[4] The arbitrator heard from twenty witnesses (including Hanna) and reviewed the PEP-T evaluation and supporting documentation. *Id.* at 1-2.

The arbitrator made Findings of Fact in a narrative fashion, and the Arbitration Decision substantiated the DOE's findings and conclusions made in the

---

[4] Hanna's Opposition primarily disputes the content of, or basis for, the Arbitration Decision. She argues that the arbitrator was biased (Doc. No. 83 at 2), and challenges the veracity of the arbitrator's Findings of Fact and the fairness of the arbitration proceedings. *Id.* at 3-6; Doc. No. 83-4. Although Hanna states in her Opposition that "the union, for the first and only time in any case, requested that my arbitration be vacated (doc. already on file)," *id.* at 2, the court could not locate a "doc. already on file" indicating that the HSTA sought to vacate the award under Hawaii Revised Statutes § 658A-23(6)(b) (requiring a motion to vacate an award within ninety days after the movant receives notice). On the contrary, Susan La Vine, who is the administrator for the DOE's Labor Relations Section, declares that the DOE has never received notice of a motion to vacate and that a search of court records revealed no motion to vacate the award. Doc. No. 84-1, at 4-5. The time has apparently passed for Hanna to challenge the arbitrator's conclusions or the fairness of the proceedings. In any event, the focus of this proceeding is whether the DOE violated Title VII.

PEP-T evaluation. Of course, the question in the current Title VII proceeding is whether there is evidence of gender or race discrimination, or of retaliation based upon protected activity, and not necessarily whether Hanna's termination was proper under DOE policy. The DOE did not rely on the Arbitration Decision to terminate Hanna, and the primary inquiry here focuses on the DOE's actions in 2006 and 2007. Nevertheless, the Arbitration Decision (1) upheld the basis for the DOE's actions, (2) validated "legitimate non-discriminatory" reasons for Hanna's termination,[5] and (3) gives a useful background for this case. The court therefore recounts significant portions of the Arbitration Decision here. Among the arbitrator's findings regarding Hanna's performance are the following:

### 1. *Psychology and History Classes*

Hanna transferred to Aiea High School from Moanalua High School at the end of August 2006 (effective September 7, 2006), near the end of the first quarter. Doc. No. 63-10 at 8. She had unspecified prior "difficulties" at Moanalua. *Id.*[6] At Aiea High School, Hanna was assigned to teach a Psychology course, two

---

[5] *See, e.g.*, *McGinest v. GTE Serv. Corp*, 360 F.3d 1103, 1122 n.16 (9th Cir. 2004) (reiterating that, after a plaintiff makes her prima facie case, "[t]he burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action") (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

[6] Although the arbitrator did not specify the nature of this prior difficulty, the record indicates that Hanna had been suspended while at Moanalua without pay for ten days on August 23, 2006 for violating certain DOE policies when she repeatedly left students unsupervised and

(continued...)

U.S. history courses, and three junior level English courses.

"[Hanna's] Psychology teaching assignment was spectacularly unsuccessful.  Four days after [Hanna] started teaching, the entire Psychology class marched into the Principal's office voicing a unified complaint about [Hanna's] competency to teach Psychology."  *Id.*  "[Hanna] was relieved of her Psychology class and assigned a third U.S. History class.  The complaints continued unabated."  *Id.*  At the start of the second quarter, the Principal went to observe Hanna's history classes.  "The Principal was appalled at what he saw:  'There was no meaningful work going on.'"  *Id.*

"To assist [Hanna], the Principal asked the curriculum coordinator to help her. . . .  However, the complaints about [Hanna] continued unabated.  No other teacher at Aiea had anywhere close to the volume and types of complaints in terms of a teacher's inability to manage, run, and set the demeanor in the class."  *Id.* at 9.  "[T]he Principal decided to hire a half time teacher . . . to take over [Hanna's] U.S. History classes for the remainder of the first semester and for the second semester."  *Id.*

_____

[6](...continued)
was not present in the classroom during instructional time.  Doc. No. 84-7.

## 2.    *English Classes*

Student and parent complaints were not restricted to Hanna's psychology and history classes.  "During the first semester of the 2006-2007 school year the Principal received no less than 20 written complaints from [Hanna's English] students.  Recurrent complaints about [Hanna] were she refused to help students, her assignments, and explanations were unclear, the students were not learning anything."  *Id.*  "The junior class counselor . . . testified that the spate of student and parent complaints about [Hanna's] teaching was unprecedented -- something he had never seen in his 21 years as a counselor."  *Id.* at 10.  "The Principal assigned Randy Ruff, the part time teacher to assist [Hanna] in [Hanna's] English classes.  *Id.*  [Hanna] initially resisted the appointment of the part time teacher, fearing that he was being sent in to spy on her.  She reluctantly accepted the help when Mr. Forrest, her Union Representative, advised her that her refusal to accept the help could later be used against her."  *Id.*

"Complaints emanating from [Hanna's] junior level English classes for the second quarter of the 2006-2007 school year seemed to center on the fact that there was only one single assignment for the quarter."  *Id.*  "Numerous complaints about this assignment erupted.  Other teachers, including Aiea's English Department Chair and the School District Language Arts Resource person,

informed the administration that they attempted to help the students and found the directions . . . to be complex, vague and confusing." *Id.* "A high number of students failed [Hanna's] course. Many students who needed this course to graduate demanded to be transferred[.]" *Id.* "[T]he complaints required the administration to permit 20 students to transfer out of [Hanna's] classes." *Id.*

"On December 19, 2006 a conference was held with [Principal] Sosa, [Hanna], Vice Principal Tabiolo and David Forrest, the HSTA Representative. They discussed the reassignment of [Hanna's] History classes to Mr. Ruff, complaints from students and their parents, [and] an incident that occurred on December 11, 2006 wherein ten male students walked out of one of [Hanna's] classes to complain about [Hanna]." *Id.* at 11. "[Hanna] was also informed that her performance during the first semester of the school was marginal to less than satisfactory. [Hanna] was informed that 'if her overall performance does not improve, that she will be rated unsatisfactory [on her PEP-T.]'" *Id.*

"During the second semester 38 students and 15 parents requested a transfer out of [Hanna's] English classes." *Id.* "The [P]rincipal testified that they continued to do observations, and on numerous occasions referred [Hanna] to the district office language arts teacher and the school's curriculum coordinator, but [Hanna] did not take advantage of these resources." *Id.*

"On February 12, 2007 the Principal and two Vice-Principals separately conducted observations of [Hanna's] English classes." *Id.* "The three evaluators concurred that directions for the lesson were unclear and the students were not informed about the objectives of the lesson, that much time was wasted [and that] many students were either confused about what they were supposed to do, or simply weren't paying attention." *Id.* at 11-12. "On February 22, 2007 a conference with [Hanna], the Principal, the two Vice-Principals, and [Hanna's] Union Representative, David Forrest, was held. At this meeting the administrators' criticism[] of [Hanna's] teaching was discussed. . . . They also discussed the fact that an inordinate number of students were failing and that requests for transfers out of [Hanna's] English classes continued to stream in." *Id.* at 12.

"After the conclusion of the second quarter[,] the Principal . . . was astonished to learn that more than 70% of [Hanna's] students were failing." *Id.* "On February 28, 2007 another conference was held . . . . The Principal warned [Hanna] that if no progress was made to address the problem of so many students failing, he would consider reassignment of her teaching responsibilities." *Id.* at 12-13.

### 3.     *PEP-T Rating of "Unsatisfactory"*

"Under PEP-T a teacher may receive three possible ratings: Satisfactory, Marginal, Unsatisfactory." *Id.* at 14.  An unsatisfactory rating for a teacher requires termination of the teacher.  In an evaluation of May 24, 2007, Principal John Sosa rated [Hanna] as unsatisfactory in all five categories, and gave her [an] overall rating of unsatisfactory.  [Hanna] was terminated effective September 5, 2007." *Id.*  "On June 12, 2007, [Hanna] and Mr. Forrest, her Union representative were permitted to meet with Mr. Navares [Acting Complex Area Superintendent for the Central Oahu District] and to submit additional documents in her defense.  Mr. Navares concurred in the Principal's recommendation for termination." *Id.*  "[Hanna] was granted a pre-termination hearing with the Superintendent on July 25, 2007 and was represented by Mr. Forrest." *Id.* Nevertheless, "the Superintendent approved the termination of [Hanna]." *Id.*

### 4.     *Substantial Evidence Supports the PEP-T Rating and Evaluation*

The arbitrator found that "substantial evidence exists to support the Principal's overall evaluation of unsatisfactory." *Id.* at 16.  "[Hanna] failed to adapt instruction/support to students' differences in development, learning styles, strengths and needs." *Id.*  "Unquestionably, with so many students and parents clamoring to get out of [Hanna's] classes, [Hanna] failed to engage the majority of

her students in any manner." *Id.* "Her plan for her second semester History class

. . . was pathetic." *Id.* "It is clear that [Hanna] was hopelessly deficient in

formulating her lesson plans in a coherent manner." *Id.*

In assessing whether Hanna was able to "create and maintain a

positive and safe learning environment," the arbitrator determined that Hanna

"failed abysmally." *Id.* at 17. "The number and nature of the disciplinary referrals

confirms that [Hanna's] classes were chaotic with terrible student behavior

frequently exhibited." *Id.* "Despite [Hanna's] contention that she got all of the

problem students, the evidence indicates that the method of assigning students to

her classes was purely neutral and random." *Id.* Hanna claimed that the

administration failed to discipline her students, and thus undermined her teaching.

To this point, the arbitrator concluded: "There was no evidence whatsoever to

support [Hanna's] contentions that the disciplinary problems she encountered

[were] due to the administration's efforts to undermine her by failing to impose

discipline." *Id.*

The arbitrator also determined that Hanna had been given ample notice

of disciplinary consequences. Hanna "was warned in a conference held December

19, 2006 . . . that her performance was marginal to unsatisfactory." "[N]umerous

other conferences were held to discuss the fact that there were so many students

11

failing her classes[.]" *Id.* at 21. He also addressed the fairness of the PEP-T

process:

> The evidence is overwhelming that the administration
> bent over backwards to give [Hanna] every opportunity to
> improve. They assigned a part time teacher to help her.
> They relieved her of classes where she demonstrated an
> inability to teach the subject matter. They transferred
> students out of her classes to alleviate the problem of
> complaints from students and parents. They referred her
> to resource teachers. . . . They held conferences with
> her . . . and made recommendations on how she could
> improve.

*Id.* at 22.

In determining that termination was appropriate even where Hanna

had not previously been rated as unsatisfactory, the arbitrator relied in part on the

magnitude of complaints and Hanna's attitude at the hearing: "Complaints about

[Hanna's] professionalism abounded. She was accused of yelling at students, being

sarcastic, being tardy, eating and drinking in front of students, refusing to help

students, failing to meet after school appointments and failing to maintain contact

with parents." *Id.* at 24. "What is striking about [Hanna's] testimony . . . is that

she totally failed to accept the least scintilla of responsibility. . . . She blamed all of

her classroom management problems on the administration for not disciplining her

misbehaving students." *Id.*

The arbitrator found Hanna's testimony was not credible: "[Hanna]

claimed that . . . she was never warned of a potentially unsatisfactory rating if her performance did not improve. She contends that the memorandum of conference confirming this admonition was falsified. This contention is not credible. The conference was witnessed by four persons, including [Hanna's] Union Representative." *Id.*

> The arbitrator concluded:
>
> Unquestionably, a large number of students were denied educational opportunities due to [Hanna's] ineptness. . . . [A]s far as being able to fulfill Duty 1 which requires a teacher to adapt instruction/support to a students' (sic) differences in development, learning styles, strengths and needs[] she appears to be a disaster. The potential damage that such a teacher could do to children's futures is considerable and cannot be ignored. I therefore conclude that the punishment in this case was appropriate and that [Hanna] was discharged for proper cause.

*Id.* at 24-25.

### 5. *Hanna's Prior EEOC Complaint and Unspecified Prior Grievances*

Earlier, in 2003, Hanna had filed a complaint regarding age and retaliation discrimination with the Hawaii Civil Rights Commission ("HCRC") and Equal Employment Opportunity Commission ("EEOC"). Doc. No. 63-14. The EEOC closed its file on that charge on July 21, 2003 as it was "unable to conclude that the information obtained establishe[d] violations[.]" *Id.* at 2.

Hanna, however, is not claiming that the DOE retaliated against her

13

for filing the HCRC/EEOC complaint in 2003. Doc. No. 83 at 2. Rather, in her

Opposition, she mentions unspecified prior grievances (appearing to have

concerned an educational matter, but possibly relating to the 2003 HCRC/EEOC

complaint) as follows:

> I never claimed a "causal link" between the '03 charge
> and termination. The links are many and far more
> insidious than that. . . . [The] Moanalua High [P]rincipal
> tried to keep me in his unruliest classes, grades 9 and 10.
> These classes, not being my forte, forced me to grieve.
> (The union did not prevail, even though my seniority and
> tenure by this time should have afforded me that choice.)
> It is these grievances, et[] al., against which the DOE
> retaliated with termination.

*Id.* The record contains no evidence as to what these prior grievances entailed, nor

when they occurred. The DOE, however, interprets Hanna's claim as referring to a

grievance or grievances filed in 2003 in relation to the 2003 HCRC/EEOC

complaint. Doc. No. 84 at 14.

### 6. *Allegations of Discrimination*

In her Opposition, Hanna makes only limited, unsupported, references

to discrimination. She writes:

> Sosa's efforts to undermine me continued by putting me
> in other teachers' classes as a tutor. Among those were
> teachers being evaluated, supposedly, just like I was.
> However, he never even appeared in any of those classes.
> Yet these teachers were found satisfactory. They were
> non-White, younger and male.

Doc. No. 83 at 9.  Her Opposition also states:

> As an older female, I was treated differently from
> younger males. . . .  Plaintiff's testimony is that DOE's
> toleration (direction) of Sosa's maltreatment of her; the
> favoritism shown to [part-time teacher] Randy Ruff, a
> male; the daily abuses suffered by Plaintiff in the forms
> of everything from being yelled at publicly to defrauding
> her documents; prove that defendant treated different
> employees of different sex and age in an unlawfully
> disparate fashion.

*Id.* at 10.  Finally, she contends:

> Mr. Ruff was ostensibly hired to assist me.  But he did
> not do what I asked him to do.  However, he was not
> disciplined for this refusal.  On the contrary, Sosa blamed
> and disciplined <u>me</u> for not using Ruff as per Sosa's
> directive.  This is clearly an example of sexual
> discrimination, disparate treatment.

*Id.* (underscore in original).

## B.     Procedural Background

After her termination, Hanna filed a charge of discrimination with the

HCRC/EEOC on September 17, 2007.  Doc. No. 63-11.  The EEOC issued a notice

of right to sue on March 26, 2008.  Doc. No. 1 at 5.  Hanna then filed her

Complaint in this court on May 23, 2008, and a First Amended Complaint on

August 6, 2008 against the DOE and Sosa.  Doc. No. 10.

On October 12, 2010, the court dismissed claims against Sosa in his

individual capacity.  The DOE filed its Motion for Summary Judgment on

November 23, 2010.  Hanna filed her Opposition on February 8, 2011, and the

DOE filed a Reply on February 25, 2011.  Under Local Rule 7.2(d), the court finds

the matter suitable for decision without an oral hearing.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential

to the party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of

Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of

informing the court of the basis for its motion and of identifying those portions of

the pleadings and discovery responses that demonstrate the absence of a genuine

issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's

Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has

carried its burden under Rule 56[(a)] its opponent must do more than simply show

that there is some metaphysical doubt as to the material facts [and] come forward

with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

## IV.  DISCUSSION

Hanna asserts claims under Title VII based upon race, sex, age, retaliation, and "harassment." FAC at 3. The DOE moves for summary judgment, primarily contending that Hanna cannot establish a *prima facie* case of

17

discrimination.  It further argues that, even if Hanna could make a *prima facie* case,

the DOE had a legitimate, non-discriminatory reason for her termination and Hanna

cannot establish that the reason was a pretext for illegal discrimination.  The DOE

also argues that any claim for retaliation fails for lack of a causal link between any

protected activity and Hanna's termination, and that in any event, there is no

evidence of pretext.

## A.    An Age Discrimination Claim Fails

Initially, the DOE argues that Hanna's age discrimination claim fails

because age is not a protected category under Title VII, and that such a claim

against the DOE under the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621 et seq, is barred by the Eleventh Amendment.  The court agrees.

Title VII makes it illegal for an employer to discriminate on the basis

of an individual's "race, color, religion, sex, or national origin."  42 U.S.C.

§ 2000e-2(a)(1).  Title VII does not protect against age discrimination.  And, to the

extent Hanna seeks to bring a separate claim under the ADEA, such a claim is

indeed barred as against a state or state actors.  *See Kimel v. Fla. Bd. of Regents*,

528 U.S. 62, 82-83 (2000) (holding that the Eleventh Amendment bars ADEA

claims against state actors).  Moreover, because the ADEA is the exclusive remedy

for age discrimination in employment, Hanna would be unable to assert an age

discrimination in employment claim against the DOE under another federal statute such as 42 U.S.C. § 1983 seeking to vindicate constitutional rights. *See Ahlmeyer v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051, 1057 (9th Cir. 2009).

Accordingly, Hanna's claim for alleged age discrimination in employment against the DOE is dismissed.

**B.** **Framework for Analyzing Title VII Claims at Summary Judgment**

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides a "useful tool at the summary judgment stage" in addressing Title VII claims. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004). Under this framework, Plaintiff has the initial burden to establish a *prima facie* case of discrimination. *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (citation and quotation omitted). A *prima facie* case under *McDonnell Douglas* requires a plaintiff to offer proof that: (1) she belongs to a protected class; (2) she performed her job adequately or satisfactorily; (3) she suffered an adverse employment action such as termination, demotion, etc.; and (4) other similarly situated employees who do not belong to the same protected class were treated differently. *McDonnell Douglas*, 411 U.S. at 802; *see Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006); *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007).

"The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997) (citation omitted). If Plaintiff puts forth her *prima facie* claim, the burden then shifts to Defendant to put forward a legitimate, non-discriminatory reason for its actions. If Defendant proffers such a reason, the burden shifts back to Plaintiff to show that Defendant's reason is actually a pretext for discrimination. *Boeing Co.*, 577 F.3d at 1049 (citation and quotation omitted).

"[A] plaintiff's burden is much less at the prima facie stage than at the pretext stage." *Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d 1151, 1158 (9th Cir. 2010). That is, circumstantial evidence of pretext must be specific and substantial, *see Becerril v. Pima Cnty. Assessor's Office*, 587 F.3d 1162, 1163 (9th Cir. 2009), and a plaintiff must do more than merely deny the credibility of the defendant's proffered reason. *See Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986). "A plaintiff can show pretext directly, by showing that discrimination [or retaliation] more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003); *see also Coghlan v. Am. Seafoods Co.*,

413 F.3d 1090, 1094-95 (9th Cir. 2005). "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory [or retaliatory] statements or actions by the employer." *Coghlan*, 349 F.3d at 1095. Circumstantial evidence requires an additional inferential step to demonstrate discrimination. *Id.*

Despite this "useful tool" of the *McDonnell Douglas* framework, there is nothing that "compels the parties to invoke the *McDonnell Douglas* presumption."￼ McGinest, *360 F.3d at 1122.* "When responding to a summary judgment motion . . . [the plaintiff] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (quoting *McGinest*, 360 F.3d at 1122). If the plaintiff submits direct or circumstantial evidence, "a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id*. (quoting *Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1221 (9th Cir. 1998)).

**C.** **Hanna's Title VII Sex and Race Discrimination Claims Fail Under a *McDonnell Douglas* Analysis**

The DOE relies on the *McDonnell Douglas* framework in its Motion for Summary Judgment, and Hanna did not present any direct or circumstantial evidence demonstrating discrimination. Accordingly, the court employs the

*McDonnell Douglas* framework in addressing Hanna's claims.

Hanna has failed to establish the fourth element of a *prima facie* case -- that other similarly-situated employees who do not belong to the same protected class as her were treated differently. Hanna argues that Sosa treated male teacher Randy Ruff differently. Doc. No. 83 at 11. But it is undisputed that Ruff was a part-time, on call, substitute teacher from 2005 to 2009, who worked part-time at Aiea during the 2006-07 school year. Doc. No. 84-3 ¶ 1. He was, at least in part, Hanna's assistant in 2006-07. *Id.* ¶ 4. There is no evidence that he was -- as was with Hanna -- being evaluated under the PEP-T process at the time.[7] Thus, Ruff was not "similarly-situated" as Hanna. *See Vasquez*, 349 F.3d at 641 ("[I]ndividuals are similarly situated when they have similar jobs and display similar conduct."). Hanna's and Ruff's duties and roles differed in many "material respects." *Hawn*, 615 F.3d at 1157 (citing *Nicholson v. Hyannis Air Serv.*, 580 F.3d 1116, 1125 (9th Cir. 2009)).

Further, even if Hanna's arguments -- construed in her favor -- could create a *prima facie* case, the DOE has ample evidence of a legitimate, non-discriminatory reason for Hanna's termination. She received unsatisfactory ratings

---

[7] To the extent Hanna claims Sosa treated her unequally by subjecting her to the PEP-T process itself -- when others outside her protected class were not -- the DOE offers unrebutted evidence that nine male, non-white Aiea High School teachers underwent the PEP-T process in the 2006-07 school year. Doc. No. 63-5 ¶ 9.

on her PEP-T evaluation.  That evaluation was upheld by an arbitrator after a lengthy grievance process.  Under the HSTA Collective Bargaining Agreement ("CBA"), a teacher with an unsatisfactory evaluation that is upheld after a grievance "shall be terminated."  Doc. No. 63-9, at 7.

Hanna has no evidence that suggests the PEP-T evaluation was a pretext for sex or race discrimination -- much less the required "specific and substantial" circumstantial evidence.  *See Becerril*, 587 F.3d at 1163.  Rather, she argues without any factual support that the arbitration findings were wrong, and that the PEP-T process was unfair and in violation of the HSTA CBA.  FAC at 2; Doc No. 83 at 5.  But Hanna's "subjective belief that the PEP-T evaluation violated the collective bargaining agreement does not, without more, demonstrate pretext." *Stucky v. State of Hawaii*, 2008 WL 214944, at *15 (D. Haw. Jan. 25, 2008), *aff'd sub nom.*, *Stucky v. Dep't of Educ.*, 337 Fed. Appx. 611 (9th Cir. 2009).

Likewise, Hanna's "subjective belief that she performed her job satisfactorily -- not supported by any evidence other than her own bare assertion -- does not establish pretext."  *Id.* at *16.  Hanna "bears the ultimate burden of submitting evidence indicating that the [DOE's] proffered reason is merely a pretext for [discrimination]."  *Id.* at *13 (quoting *Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007)).  She has no such evidence.  Hanna "needs to do more

23

than merely deny the credibility of [the DOE's] proffered reason." *Id.* (citing *Schuler*, 793 F.2d at 1011).

What's more, as analyzed above, the DOE has unrebutted evidence that Ruff -- whom Hanna contends was treated more favorably than her -- was not similarly situated as Hanna. It has unrebutted evidence that Hanna was not singled out on the basis of race or gender for a PEP-T evaluation -- nine other non-white male teachers also had PEP-T evaluations during the school year. *See* Doc. No. 63-5 ¶ 9. These established facts further demonstrate a lack of pretext. *See Hawn*, 615 F.3d at 1158-59 (indicating the "similarly situated" inquiry is useful at both the prima facie and pretext stages of the *McDonnell Douglas* analysis).

## D.   A Title VII Retaliation Claim Fails

Under Title VII, an employer may not discriminate against an employee because the employee has opposed an employment practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice [prohibited by Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ("Title VII's anti-retaliation provision

forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and quotation signals omitted)).

To make a *prima facie* showing of retaliation, a plaintiff must show that (1) she engaged in a protected activity; (2) defendants took an adverse action against her; and (3) there was a causal link between her involvement in the protected activity and the adverse personnel action undertaken by the defendants. *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006); *McGinest*, 360 F.3d at 1124. An adverse employment action is one that a reasonable employee would find to be materially adverse, or which would dissuade a reasonable worker from filing a discrimination charge. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67-68. The *McDonnell Douglas* burden-shifting framework applies to Plaintiff's retaliation claims. *See McGinest*, 360 F.3d at 1124.

Applying the framework here, there are two potential prior instances of protected activity (although Hanna has not met her burden to establish which might apply): (1) a grievance related to Hanna's 2003 HCRC/EEOC complaint

alleging age discrimination and retaliation (Doc. No. 63-14),[8] and (2) unspecified

other grievances, apparently related to teaching conditions or contractual matters.

Doc. No. 83 at 2. Hanna's retaliation claim fails in either instance.

### 1. Retaliation Based on a 2003 Complaint or Grievance

As to the 2003 incident (assuming it was a matter "oppos[ing] a

practice that Title VII forbids" under *Burlington N. & Santa Fe Ry. Co*., 548 U.S. at

59), there is no evidence of a "causal link" between Hanna's termination in 2007

and the prior protected activity. Indeed, a four-year time difference between the

protected activity and the adverse action suggests a lack of retaliatory motive. *See,*

*e.g.*, *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("A

nearly 18-month lapse between protected activity and an adverse employment

action is simply too long."); *Vasquez*, 349 F.3d at 646 (finding no causal link where

the protected activity occurred thirteen months prior to the alleged adverse action

and where plaintiff provided no evidence of surrounding circumstances showing a

retaliatory motive); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-

74 (2001) (reasoning that an "[adverse] action taken . . . 20 months later [than that

protected activity] suggests, by itself, no causality at all" and citing case law where

---

[8] As explained above, Hanna is not claiming that the 2003 HCRC/EEOC complaint itself
is the basis for her retaliation claim. Doc. No. 83-2.

a three- and four-month period between the protected activity and adverse action was not close enough, without more, to establish causation).

Although "[t]here is no set time beyond which acts cannot support an inference of retaliation," *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003), here there is no evidence suggesting any causal link between a 2003 grievance by Hanna and a 2007 termination by the DOE.  Sosa testified by declaration that he did not know Hanna before the 2006-07 school year (and thus did not know her in 2003 when she may have filed a prior grievance).  Sosa was the Principal at a different school (Aiea High School) than the school (Moanalua High School) apparently involved in Hanna's prior grievance.

Moreover, even if Hanna could establish some causal link between that prior grievance and her 2007 termination, the DOE certainly has a legitimate, non-discriminatory reason for her termination -- the PEP-T evaluation (upheld by an arbitrator) with unsatisfactory ratings.  And, as with the Title VII race and gender claim analyzed above, Hanna simply has no evidence of pretext.

### 2. *Retaliation Based on Other Unspecified Grievances*

As for other unspecified and more recent grievances, Hanna has presented no evidence that any other grievances involved protected activity.  Hanna describes the basis for her retaliation claim as follows:

> When first working for the DOE, I was assigned to one of
> its most challenging schools, Waianae High.  Noted for
> its multiple daily fights, I never had so much as a face-off
> in my classroom in my five (5) years there.  Later, known
> for my classroom management, Moanalua High
> [P]rincipal tried to keep me in his unruliest classes, grades
> 9 and 10.  These classes, not being my forte, forced me to
> grieve.  (The union did not prevail, even though my
> seniority and tenure by this time should have afforded me
> that choice.)  It is these grievances, et[] al., against which
> the DOE retaliated with termination.

Doc. No. 83 at 2.  Such a grievance -- related to a contractual or teaching-condition

issues -- cannot form the basis of a Title VII retaliation claim because it must be

based on opposing Title VII violations, not contractual matters.  *See, e.g.*, *Stucky v.*

*State of Hawaii*, 2007 WL 602105, at *4 (D. Haw. Feb. 15, 2007) ("Grievances

filed for simple contract violations [not pertaining to race or gender] of collective

bargaining agreements do not qualify.").

Similarly, there is some indication that Hanna might have filed a

grievance related to a ten-day suspension in 2006 while at Moanalua High School.

*See* Doc. No. 84-7.  Even if, however, there had been a grievance related to this

2006 matter, nothing indicates it was related to age, race, gender, or retaliation.  As

noted earlier, it involved suspension for absences from the classroom.

Furthermore, even if the record is unclear as to whether a more-recent

grievance could form the basis of "protected activity," such a retaliation claim

would fail for similar reasons as Hanna's other claims fail: the DOE's legitimate, non-discriminatory reason for her termination and Hanna's lack of any evidence of pretext.

## E.    A "Harassment" Claim Fails

The FAC asserts a claim for "harassment" and alleges that "Sosa broke the contract between DOE and HSTA by . . . harassing me continuously, [and] by subjecting me to 'inhumane' treatment." FAC at 2. Hanna makes no further explanation as to the basis for this claim, and the court concludes that the claim fails as a matter of law.

Construing Hanna's allegations broadly, Hanna might be attempting to assert a claim for a "hostile work environment" under Title VII. A hostile work environment claim requires a plaintiff to show that: (1) she was subjected to verbal or physical conduct of a racial nature (or of a sexual nature for a claim of sexual harassment); (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the employee's conditions of employment and create an abusive work environment. *Vasquez*, 349 F.3d at 642; *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005). There simply is no evidence that Plaintiff was subjected to any severe or pervasive conduct of a racial or sexual nature. Even assuming for purposes of summary judgment that Hanna was subjected to

"inhumane" treatment, a Title VII hostile environment claim is not protection against a bad workplace. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("Title VII [is] not . . . a 'general civility code.'"). Rather, it is protection against workplace hostility *because of a protected ground* (race, sex, religion, national origin). 42 U.S.C. § 2000e-2(a)(1). Thus, to the extent Hanna is attempting to assert a hostile environment claim, such a claim fails.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Defendant State of Hawaii, Department of Education's Motion for Summary Judgment is GRANTED.

The DOE cannot be liable under the Age Discrimination in Employment Act.

The Title VII claims fail. Hanna has failed to establish a *prima facie* case for discrimination based on sex or retaliation. Even if she is able to do so, the DOE has a legitimate, non-discriminatory reason for Hanna's termination, and there is no evidence of pretext.

///

///

///

///

Accordingly, the DOE is entitled to judgment as a matter of law. Judgment shall enter in favor of Defendants. The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 29, 2011.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Hanna v. Dep't of Educ.*, Civ. No. 08-00243 JMS/KSC, Order Granting State of Hawaii, Defendant Department of Education's Motion for Summary Judgment